IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA　　　　:

　　　　v.　　　　　　　　　　　　:　　　　CRIMINAL NO. 25-508

DIANTE SMITH　　　　　　　　　　:

GOVERNMENT'S PLEA MEMORANDUM

I.　　INTRODUCTION

The defendant, Diante Smith, has agreed to plead guilty to Count One of an information, waiving prosecution by indictment, charging him with bribery in sporting contests, and aiding and abetting, in violation of 18 U.S.C. § 224 and 2, and not to contest forfeiture as set forth in the notice of forfeiture charging criminal forfeiture under 28 U.S.C § 2461(c) and 18 U.S.C § 981(a)(1)(C). The charges arise from the defendant's participation in a scheme to influence or "fix" Chinese Basketball Association ("CBA") basketball games and National Collegiate Athletic Association (NCAA") men's basketball games. The participants in the scheme engaged in the illegal activity from at least September 2022 through at least February 2025, in the Eastern District of Pennsylvania, and elsewhere. During the 2023-2024 season, the defendant was a forward on the Nicholls State University Colonels Men's Basketball Team ("Nicholls State"). As discussed further below, Smith engaged in this scheme by accepting bribes to influence NCAA basketball games. This Court has scheduled an Arraignment and Change of Plea Hearing for Wednesday, January 7, 2026, at 12:30 p.m.

1

## II.    STATUTORY MAXIMUM PENALTIES

The Court may impose the following statutory maximum sentences: For Count One, charging bribery in sporting contests, a term of imprisonment of 5 years, a term of supervised release of 3 years, a fine of $250,000, and a special assessment of $100. Full restitution also shall be ordered. Forfeiture of all proceeds from the offense also may be ordered.

## III.    ELEMENTS OF THE OFFENSE – BRIBERY IN SPORTING CONTESTS

To establish a violation of 18 U.S.C. §224 (bribery in sporting contests), the government must prove the following elements beyond a reasonable doubt:

(1)    the defendant carried into effect, attempted to carry into effect, or conspired with another person to carry into effect a scheme;

(2)    the scheme operated in commerce;

(3)    the scheme was intended to influence, in any way, by bribery, a sporting contest; and

(4)    the defendant acted with knowledge that the purpose of the scheme was to influence by bribery that contest.

To establish that the defendant committed the offense of 18 U.S.C. § 224 under an aiding and abetting theory of liability under 18 U.S.C. § 2, the government must prove the following elements beyond a reasonable doubt:

(1)    the principal, or another participant in the scheme, committed the offense of bribery in sporting contests as set forth above;

(2)    the defendant knew that this offense was going to be committed or was committed by the principal, or another participant in the scheme;

(3)    the defendant knowingly did some act for the purpose of aiding, assisting, soliciting, facilitating, or encouraging the principal, or other participant in the scheme, in committing this offense; and

2

(4)     the defendant performed an act in furtherance of this offense.

*See* Third Circuit Model Criminal Jury Instruction 7.02.

## IV.     FACTUAL BASIS FOR THE PLEA

If this case were to proceed to trial, the government would prove the following facts, among others, through witness testimony and exhibits.

### A.  General Background

The integrity of sporting contests rests on the fundamental principles of fairness, honesty, and respect for the rules of competition. To ensure fair outcomes, these contests depend upon genuine competition, free from corruption, manipulation, and bribery. In 1964, Congress enacted the Sports Bribery Act, codified at Title 18, United States Code, Section 224, to prohibit bribery in sporting contests, recognizing that corrupt influences undermine these principles and erode public confidence in the legitimacy of sport. This statute helps ensure that the organizing institutions, governing bodies, players, coaches, bettors, and fans can trust that every sporting contest is decided on merit, not by corruption.

The National Collegiate Athletic Association ("NCAA") was a non-profit organization that governed college sports and sporting contests in the United States. Collectively, there were more than 350 NCAA Division I colleges that fielded more than 6,000 sports teams and provided opportunities for more than 170,000 players to compete in NCAA sports each year. The NCAA set and enforced rules promoting integrity, sportsmanship, and fair competition. Those rules included specific prohibitions on players, coaches, and other individuals associated with an NCAA sports team from participating in any sports wagering activity, including providing

3

information to individuals involved in or associated with any type of sports wagering activities concerning intercollegiate, amateur, or professional athletics competition.

Under NCAA rules, players could earn money for the use of their name, image, and likeness ("NIL") through activities such as endorsements, sponsorships, and appearances. Division I players were also permitted to enter the "transfer portal" each year and transfer schools without penalty, and players frequently moved between schools in the hopes of obtaining more money through NIL activities or collectives and more opportunities on another team.

The Chinese Basketball Association ("CBA") was the governing body for basketball in China and the name of the country's top professional basketball league. The CBA comprised more than 300 players in its top men's league and about 20 teams, which represented cities and corporations throughout China.

Gambling outlets such as casinos, online wagering businesses, offshore betting houses, and illegal bookmakers, or "bookies," accepted wagers on sporting contests, including basketball games. These gambling outlets, often known as sportsbooks, used a "point spread" for sporting events such as basketball games, so that bettors could place wagers based on the relative performance of a team rather than simply betting on which team would win. The point spread was the predicted scoring difference between the two opponents in a sporting contest. The point spread defined which team was the favorite and which team was the "underdog," that is, the predicted losing team. For a bettor to win a wager placed on the favorite team, the favorite team had to win by more than the point spread number. For a bettor to win a wager placed on the "underdog" team, the "underdog" team had to either win the contest, or lose by less than the point spread number. For example, if Team A was the "underdog" team by three points, then a

4

bettor who bet on Team A would have won the wager if Team A either won the game, or if Team A lost the game by one or two points. Gambling outlets provided point spreads for the outcome of the entire game or a portion of the game, such as the first half or second half, allowing bettors to place multiple bets on a single game. In sports betting, to "cover" a point spread meant a team performed in a way that satisfied the conditions of the point spread set by oddsmakers.

Among the options for those wagering on sporting events with gambling outlets, individuals could also bet on games without regard to the point spread, by simply betting on a particular team to win a game. Those bets were called "money line" bets. Individuals could also make "parlay" bets, which were bets comprising two or more individual bets. To succeed on a parlay bet the bettor had to win all the bets made in the parlay. Parlay bets paid out at a higher rate than bets on individual games because they were more difficult to win.

A basketball game, or portion of a game, could be manipulated, or "fixed," by, among other means, a single player or multiple players on one team agreeing to influence the game's outcome, generally by underperforming or otherwise trying to limit the number of points scored by their team. This allowed individuals gambling on the score of the game, who were working with the players "fixing" the game, to profit by placing a wager on the game with a higher degree of certainty as to the game's outcome. Such a scheme, customarily called "point shaving," involved an effort by a player or players to underperform in a game, or by some other means, to ensure that their team scored only a certain number of points during a game or during a portion of a game. The players involved in fixing a game altered their performance, or supported their

teammates altering their performances, based on the point spread on that game so that their team would not "cover" the spread.

### B.  The Scheme

Beginning in or about September 2022, a group of individuals known to the United States Attorney ("the fixers") worked together to recruit and bribe players to help influence or "fix" CBA games through "point shaving" during the 2022-2023 season. The fixers bribed CBA players to fix games and then, through various gambling outlets, placed large wagers on those games against the teams whose players they had bribed.

After profiting on the fixed CBA games, the fixers turned their attention to NCAA men's basketball games. During the 2023-2024 and 2024-2025 NCAA men's basketball seasons, the fixers agreed to recruit NCAA players who would accept bribe payments in exchange for helping to influence outcomes of NCAA basketball games. In particular, the fixers agreed to recruit into the scheme players who would help ensure that their team failed to cover the spread of the first half of a game or an entire game. The fixers would then place wagers on those games through the gambling outlets, betting against the team whose player or players they had bribed to engage in this point-shaving scheme. Because of the proliferation of legalized sports betting, the fixers could use numerous gambling outlets to make their bets on these games and conceal the scheme from authorities.

Five of those fixers, Person A, Person B (charged elsewhere), Person C, Person D, and Person E, all known to the United States Attorney, then approached and communicated with NCAA basketball players, in person and through social media and cellular telephone calls. In these communications, the fixers offered the players bribe payments, usually ranging from

$10,000 to $20,000 per game, to participate in the scheme. The fixers also attempted to recruit multiple players from a team to join the bribery scheme and further ensure its success. Many of these players accepted the offers and agreed to help fix specific games so that the fixers would win their wagers. The fixers targeted for their scheme NCAA basketball players for whom the bribe payments would meaningfully supplement or exceed legitimate NIL opportunities.

Person A, Person B, Person C, Person D, and Person E had credibility with many of the players and could approach them to engage in this scheme because of their prominence, experience, and reputation in local and national basketball communities. Person A was a resident of North Carolina who was active in the training and development of basketball players for professional scouting combines. Person B was a resident of Florida and a former McDonald's All-American and college basketball player who also played professional basketball in the National Basketball Association ("NBA") and overseas and who had himself accepted bribes from his co-schemers to underperform in CBA games. Person C was a resident of Mississippi and a high-stakes sports gambler, social media influencer, and sports handicapper who sold betting advice to others. Person D was a resident of Arkansas and a former coach and trainer for high school and Amateur Athletic Union ("AAU") basketball teams and players. Person E was a resident of New York and a former college basketball player.

As the fixers had agreed, Person A, Person B, Person C, Person D, and Person E then communicated with the NCAA basketball players who had agreed to participate in the bribery scheme and directed them to underperform or otherwise help influence the outcome of particular games or a specific portion (generally the first half) of particular games.

7

Person A, Person B, Person C, Person D, Person E, and Person F, a resident of Philadelphia and Nevada and a high-stakes sports gambler, also known to the United States Attorney, as well as other co-schemers, then placed bets with numerous gambling outlets on NCAA men's basketball games involving the bribed NCAA players. They placed these bets in a manner that was consistent with the way in which they had arranged to fix the outcome of a game, or a portion of a game, to maximize their chances of winning their wagers. The bribed NCAA players then influenced, attempted to influence, and conspired to influence the outcome of their games through intentionally poor performances, removing themselves from games, supporting their teammates who were also involved in the scheme, and through other means.

At times, while Person F was in the Eastern District of Pennsylvania, the other fixers communicated and strategized about the scheme with Person F, and Person F placed bets on the fixed games with online gambling outlets and in person at casinos. At least one of those fixed games occurred in the Eastern District of Pennsylvania. In addition, individual bettors unaware of the scheme placed bets on the fixed games, often on the other side of the fixers' bets, in the Eastern District of Pennsylvania, resulting in losses to the individual bettors.

When the fixers were successful with their wagers on fixed games, Person A and other co-schemers traveled to NCAA school campuses and made cash bribe payments to the players who had agreed to participate in the scheme. On at least one occasion, Person A travelled to the Eastern District of Pennsylvania through the Philadelphia International Airport to pay one of the bribed players.

8

In or about February 2024, Person A, Person B, Person E, and a teammate of Smith, Person G, known to the United States Attorney, communicated with Smith via the FaceTime application. With the encouragement and support of Smith's teammate (Person G), Person A, Person B, and Person E offered bribe payments to Smith and Person G to fix, through point shaving, the outcome of an upcoming basketball game between Nicholls State and McNeese State University ("McNeese State"). In particular, Person A, Person B, and Person E explained to Smith that he and Person G needed to ensure that Nicholls State did not cover the spread in the game, and that if the scheme succeeded, the players would each be paid approximately $20,000. Smith agreed to participate in the scheme.

On or about February 17, 2024, Nicholls State played McNeese State in a NCAA men's basketball game on the home court of Nicholls State in Thibodaux, Louisiana. McNeese State was favored to win the game by approximately 12 points at gambling houses throughout the United States and elsewhere. At various times before the men's basketball game between Nicholls State and McNeese State, on or about February 17, 2024, participants in the scheme and others acting at their direction, placed wagers of at least approximately $100,000 on McNeese State, most of which were on McNeese State to win the game by more than approximately 12 points. [1]

---

[1] Obtaining complete information on bets placed by individuals is impossible. There are numerous betting outlets in the United States and elsewhere, legal and illegal, and numerous ways to make bets that cannot be traced. The government has identified in this memorandum and seeks to hold the defendant responsible only for the bets that it could find that were attributable to the scheme even though the number of those bets is likely higher.

On or about February 17, 2024, in the men's basketball game between Nicholls State and McNeese State, defendant DIANTE SMITH and his teammate, Person G, underperformed as they had agreed. As a result, McNeese State defeated Nicholls State by a score of 74 to 47, which was by more than the approximately 12-point spread, resulting in the participants in the scheme winning their bets.

Shortly after this game, Person A traveled to Louisianna and arranged for the delivery of $32,000 in cash to Smith and his teammate, Person G, as bribe payments for their roles in helping to ensure that Nicholls State did not cover the spread in the game against McNeese State.

## V.    PLEA AGREEMENT

The parties have executed a plea agreement that will be presented to the Court during a hearing regarding entry of the guilty plea. The agreement includes a supplement to be filed under seal.

## VI.    CONCLUSION

The government requests that the Court conduct a hearing under Federal Rule of Criminal Procedure 11 and if warranted, then accept the defendant's plea of guilty.

Respectfully submitted,

DAVID METCALF
United States Attorney


/s/ Louis D. Lappen
LOUIS D.  LAPPEN
JEROME M. MAIATICO
Assistant United States Attorneys

10

-11-

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I caused a true and correct copy of the foregoing

Government's Change of Plea Memorandum to be served by e-mail upon the following counsel

for the defendant:

Abigail Gustafson, Esq.
Van Der Veen, Hartshorn, Levin & Lindheim
1219 Spruce Street
Philadelphia, PA 19107
Lonny@libertylawteam.com


*/s/ Louis D. Lappen*
LOUIS D. LAPPEN
Assistant United States Attorney


Date: January 2, 2026

-11-